2019 IL App (1st) 182189

FIRST DISTRICT
FOURTH DIVISION
September 26, 2019

No. 1-18-2189

|  |  |  |
|---|---|---|
| NINA TRILISKY, individually and on behalf of all others similarly situated, | ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 15 CH 16334 |
| THE CITY OF CHICAGO, | ) ) ) | |
| Defendant-Appellee. | ) ) ) ) | Honorable Michael F. Otto, Judge Presiding. |

JUSTICE REYES delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff Nina Trilisky appeals from an order of the circuit court of Cook County granting defendant, city of Chicago's (City), motion to dismiss her amended class action complaint pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2018)).  Plaintiff's amended class action complaint (amended complaint) alleged that sales to and from the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) are exempt from the Chicago Real Property Transfer Tax (transfer tax) (Chicago Municipal Code § 3-33-010 *et seq*. (added Dec. 15, 1992)) because the

transfers involve "real property acquired by or from any governmental body" (Chicago Municipal Code § 3-33-060(B) (amended May 8, 2013)). Plaintiff further claimed the City has been improperly collecting the transfer tax on such sales. The City moved to dismiss the amended complaint, arguing that (1) Fannie Mae and Freddie Mac (the enterprises) are not governmental bodies, and (2) plaintiff failed to exhaust her administrative remedies. The circuit court agreed with the City that the enterprises were not governmental bodies and dismissed the amended complaint pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2018)).

¶ 2    On appeal, plaintiff contends the circuit court erred in dismissing her amended complaint because the court improperly concluded that the enterprises are not "governmental bodies" exempt from the transfer tax (Chicago Municipal Code § 3-33-060(B) (amended May 8, 2013)). For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Plaintiff filed a class action complaint in the circuit court of Cook County alleging that she was improperly assessed the City's transfer tax (Chicago Municipal Code § 3-33-010 *et seq.* (added Dec. 15, 1992)) on property transferred to her by Fannie Mae in 2014. Specifically, plaintiff claimed that the transfer tax was preempted by federal law which expressly exempted the enterprises from all state and local taxation.

¶ 5    Trilisky's case was consolidated with another separate class action suit filed by Lelani Fetrow that alleged the same theory of recovery. The matters were transferred to the law division. Thereafter the cases were stayed pending the resolution of federal litigation in the Northern District of Illinois involving the same issue. After the Seventh Circuit determined that the City's transfer tax was not preempted when assessed against private parties purchasing real property from the enterprises (*Federal National Mortgage Association v. City of Chicago*, 874

F.3d 959 (7th Cir. 2017)), Trilisky requested and was granted leave to file an amended complaint.

¶ 6     The amended complaint named only Trilisky (and "all others similarly situated") and included only her case number.  Trilisky abandoned her original theory in the amended complaint and alleged purchases from the enterprises were exempt from the transfer tax under the Chicago Municipal Code (Municipal Code) because they involved "real property acquired by or from any governmental body."  Chicago Municipal Code § 3-33-060(B) (amended May 8, 2013).  Trilisky based her theory on Congress's creation of the Federal Housing Finance Agency (Agency) in 2008 and the fact that the Agency (1) subsequently placed the enterprises into a conservatorship, (2) appointed itself as conservator, and (3) consequently succeeded to "all rights, titles, powers, and privileges of [the enterprises]."  Trilisky alleged she voluntarily "paid the taxes on the mistaken assumption that they were due as she did not know that the transfer taxes were exempt, did not know the details regarding application of the taxes, and did not have knowledge of any facts that could be used to frame a protest of the transfer taxes."

¶ 7     In support of her new theory, Trilisky alleged the following facts about the enterprises. Government-sponsored enterprises like Fannie Mae and Freddie Mac have long had a role in the nation's real estate financing.  In 1938, the United States Congress established Fannie Mae as a federal agency.  Its mandate was to "establish secondary market facilities for residential mortgages," to "provide stability in the secondary market for residential mortgages," and to "promote access to mortgage credit throughout the Nation."  12 U.S.C. § 1716 (2018).  By purchasing loans insured by the Federal Housing Administration from private lenders, Fannie Mae created liquidity in the mortgage market, providing lenders with money to fund new home loans.  In 1954, Congress transformed Fannie Mae from a government agency into a public-

private, mixed ownership corporation. Congress also exempted Fannie Mae from all state and local taxes, except real property taxes. In 1968, Congress reorganized Fannie Mae from a mixed ownership corporation to a for-profit, shareholder-owned company.

¶ 8     Congress established Freddie Mac in 1970 to help small "thrift" banks manage challenges associated with interest rate risk. Freddie Mac was initially authorized to purchase long-term mortgages from thrifts, increasing their capacity to fund additional mortgages and reducing their interest rate risk. Congress also authorized the enterprises to buy and sell mortgages not insured or guaranteed by the federal government. Congress subsequently reorganized Freddie Mac's corporate structure to one similar to Fannie Mae's: a for-profit corporation owned by private shareholders.

¶ 9     Trilisky further alleged that from 1989 to 2008, both of the enterprises were private companies. During the 2008 sub-prime mortgage housing crisis, however, Congress created the Agency (through the Housing and Economic Recovery Act of 2008 (12 U.S.C. § 4511 (2018))) in order to regulate the enterprises. The Agency was granted the power to place either enterprise into a conservatorship or receivership and to otherwise preserve and conserve the enterprises' assets. 12 U.S.C. § 4617 (2018). In September 2008, the director of the Agency placed the enterprises into a conservatorship and appointed the Agency as conservator, with the Agency succeeding to all rights, powers, and privileges of the enterprises. 12 U.S.C. § 4617(b)(2) (2018). Congress also granted the Agency the authority to transfer or sell any asset or liability of the enterprises. 12 U.S.C. § 4617(b)(2)(G) (2018). The enterprises and the Agency were exempt from "all taxation" imposed by any state or local government, with one exception that does not apply here. 12 U.S.C. § 1723a(c)(2) (2018); 12 U.S.C. § 1452(e) (2018); 12 U.S.C. 4617(j)(2) (2018).

¶ 10    Trilisky additionally alleged the City imposes the transfer tax on "the privilege of transferring title to, or beneficial interest in, real property located in the city." The transfer tax is composed of two portions, the "City portion" and the "C.T.A. portion." Chicago Municipal Code § 3-33-030(A), (F) (amended Nov. 16, 2011). The "City portion" of the transfer tax is imposed "on the purchaser, grantee, assignee or other transferee," at a rate of $3.75 per $500.00 of the transfer price. Chicago Municipal Code § 3-33-030(A), (C) (amended Nov. 16, 2011). In addition, the "C.T.A. portion" imposes a supplemental tax at the rate of $1.50 per $500 of the transfer price for the purpose of providing financial assistance to the Chicago Transit Authority. Chicago Municipal Code § 3-33-030(F) (amended Nov. 16, 2011). The C.T.A. portion is paid by the transferor, "provided that if the transferor is exempt from the tax solely by operation of state or federal law," then the tax is to be paid by the transferee. Chicago Municipal Code § 3-33-030(F) (amended Nov. 16, 2011). The transfer tax ordinance further provides that "[t]ransfers involving real property acquired by or from any governmental body" are exempt from the tax. Chicago Municipal Code § 3-33-060(B) (amended May 8, 2013). Trilisky alleged that the enterprises are governmental bodies and purchases from them are therefore exempt from the transfer tax.

¶ 11    Trilisky sought (1) a declaratory judgment that the City cannot impose the transfer tax on purchasers of real property from the enterprises, (2) an injunction, and (3) a refund of the amount paid to the City.

¶ 12    The City filed a motion to dismiss pursuant to sections 2-615 and 2-619(a)(9) of the Code (735 ILCS 5/2-615, 2-619(a)(9) (West 2018)) arguing that (1) the enterprises were not governmental bodies, and thus Trilisky was appropriately assessed the tax, and (2) Trilisky failed to exhaust her administrative remedies prior to filing her complaint in the circuit court.

¶ 13 In response, Trilisky asserted the enterprises were governmental bodies because the Agency was appointed as their conservator and succeeded to all of their rights, titles, powers, and privileges. Trilisky further maintained DuPage County considers the enterprises to be governmental bodies and exempts them from a similar tax. In support of this proposition, Trilisky relied on a memorandum issued by the DuPage County Recorder stating that "the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) are exempt from real estate transfer taxes." Trilisky additionally argued she was not required to exhaust the administrative remedies prior to filing the instant lawsuit where (1) the tax was unauthorized by law or levied upon exempt property, and (2) there were no issues of fact presented and agency expertise was not involved.

¶ 14 After the matter was fully briefed and argued, the circuit court granted the City's motion to dismiss pursuant to section 2-615 of the Code, holding that the enterprises were not governmental bodies and transfers of real property from them therefore were not exempt under the transfer tax. The circuit court acknowledged that the only authority Trilisky cited for her proposition that the enterprises were governmental bodies was the DuPage County Recorder's memorandum, which the court stated contained no discussion or analysis and did not address whether the enterprises were governmental bodies. The circuit court further observed that the only case referenced in the memorandum issued by the DuPage County Recorder, *Fannie Mae v. Hamer*, 2013 WL 591979 (N.D. Ill. Feb. 13, 2013), simply held that the enterprises' federal charters expressly exempt them from state and local taxes. In addition, the circuit court concluded it would not have dismissed the amended complaint for Trilisky's failure to exhaust administrative remedies because she satisfied an exception to the general rule of exhaustion by challenging the tax as "unauthorized by law."

¶ 15    Following the decision rendered by the Seventh Circuit in *Federal National Mortgage Association*, Fetrow did not amend her complaint and pursued the matter no further. *Federal National Mortgage Association*, 874 F.3d 959.  She subsequently voluntarily dismissed her complaint with prejudice pursuant to an agreed dismissal order.  The order stated that the circuit court's order granting the City's motion to dismiss Trilisky's amended complaint "disposed of all counts brought in *Fetrow v. City of Chicago, et al*."  Trilisky's and Fetrow's classes were never certified.

¶ 16    Trilisky appealed the dismissal of her amended complaint and named Fetrow as a plaintiff in the notice of appeal.  For the reasons that follow, we conclude that we do not have jurisdiction over Fetrow and further conclude that the matter was properly dismissed because the enterprises are not governmental bodies.

¶ 17                                    II.  ANALYSIS

¶ 18    On appeal, Trilisky maintains that the circuit court erred when it determined the enterprises do not fall within the scope of the "governmental body" exemption to the transfer tax (Chicago Municipal Code § 3-33-060(B) (amended May 8, 2013)).  Prior to addressing the merits of the appeal, however, we must address our jurisdiction over Fetrow who was only nominally listed in the caption of the notice of appeal.

¶ 19                              A.  Jurisdiction Over Fetrow

¶ 20    The filing of a notice of appeal is the jurisdictional step that initiates appellate review. *General Motors Corp. v. Pappas*, 242 Ill. 2d 163, 176 (2011).  "Unless there is a properly filed notice of appeal, the appellate court lacks jurisdiction over the matter and is obliged to dismiss the appeal." *Id*.  Illinois Supreme Court Rule 303(b) (eff. July 1, 2017) provides that a notice of appeal "shall specify the judgment or part thereof or other orders appealed from."  "A notice of

appeal confers jurisdiction on a court of review to consider only the judgments or parts of judgments specified in the notice of appeal." *General Motors Corp.*, 242 Ill. 2d at 176. Here, the notice of appeal did not list Fetrow's circuit court case number nor did it list the order voluntarily dismissing her complaint as an order from which she appealed.

¶ 21 The fact that these complaints were consolidated before the circuit court does not necessarily mean that they will be reviewed as a singular action before this court. Actions pending in the same court may be consolidated "as an aid to convenience, whenever it can be done without prejudice to a substantial right." 735 ILCS 5/2-1006 (West 2016). Our courts have recognized three different forms of consolidation: (1) where several cases are pending involving substantially the same subject matter, the court may stay the proceedings in all but one and then determine whether the disposition of the one case may settle the others, thereby avoiding multiple trials on the same issues; (2) where several cases involve an inquiry into the same event in its general aspects, the cases may be tried together, but with separate docket entries, verdicts and judgments, the consolidation being limited to a joint trial; and (3) where several actions are pending that might have been brought as a single action, the cases may be merged into one action thereby losing their individual identities, and be disposed of in one suit. *Black Hawk Motor Transit Co. v. Illinois Commerce Comm'n*, 383 Ill. 57, 67 (1943); *Turner v. Williams*, 326 Ill. App. 3d 541, 547 (2001).

¶ 22 Here, the cases were consolidated only for convenience and economy, and the consolidation did not merge the causes into a single suit, which would have changed the rights of the parties and made those who were parties in one suit parties in another. See *Shannon v. Stookey*, 59 Ill. App. 3d 573, 577 (1978). In the proceedings below, the City filed an unopposed motion to consolidate Trilisky's and Fetrow's cases, which the circuit court granted. While the

circuit court did not indicate in its order the purpose of the consolidation, it is evident from the record that the consolidation was done within the second category. The circuit court entered separate orders under Trilisky's and Fetrow's respective case numbers. When the stay was lifted, Trilisky sought and was granted leave to amend her complaint. Trilisky did not seek permission to file a consolidated amended complaint nor did Trilisky add Fetrow as a plaintiff in her complaint. Thereafter, the City directed its motion to dismiss specifically against Trilisky's complaint, not Fetrow's. The circuit court's order was similarly entered solely on the propriety of Trilisky's complaint and dismissed it under her case number. Two weeks later, the circuit court entered a separate "agreed dismissal order" dismissing Fetrow's complaint with prejudice. While the agreed dismissal order indicated that the Fetrow complaint was dismissed due to its consolidation with the Trilisky case, the record discloses that in dismissing Trilisky's complaint the circuit court did not consider the basis of Fetrow's complaint (federal preemption), but instead dismissed the matter based on its construction of the term "governmental bodies" as stated in the Municipal Code and alleged in Trilisky's complaint. Due to the separate nature of the pleadings before the circuit court (and the respective orders dismissing them) as well as Fetrow's failure to file a notice of appeal from the final order entered in her case, we conclude that we do not have jurisdiction to consider claims specifically related to Fetrow on appeal.[1] Compare *Kassnel v. Village of Rosemont*, 135 Ill. App. 3d 361, 364-65 (1985), and *Dowe v. Birmingham Steel Corp.*, 2011 IL App (1st) 091997, ¶ 23 (concluding the circuit court's order of summary judgment applied to all of the 32 consolidated cases giving rise to only one judgment to be appealed from). We now turn to examine the merits of the dismissal of Trilisky's amended complaint.

---

[1] We further observe that no issues are raised on appeal regarding Fetrow's pleading.

¶ 23                              B.  Exhaustion of Remedies

¶ 24    At our request, the parties briefed the issue of whether plaintiff should have exhausted her administrative remedies prior to filing a complaint in the circuit court.  Plaintiff contends the City has forfeited the issue by failing to raise it in its opening brief.  See *Amalgamated Transit Union v. Illinois Labor Relations Board*, 2017 IL App (1st) 160999, ¶ 59.  "Forfeiture, however, is a limitation on the parties and not on this court, which has a responsibility to achieve a just result and maintain a sound and uniform body of precedent."  *Pedersen v. Village of Hoffman Estates*, 2014 IL App (1st) 123402, ¶ 44.  We are not required to disregard new arguments and, in the interest of achieving a just result, we therefore consider and discuss the issue below.  See *Amalgamated Transit Union*, 2017 IL App (1st) 160999, ¶ 60.

¶ 25    While our supreme court generally requires strict compliance with the rule requiring exhaustion of administrative remedies, it has recognized several exceptions.  *Office of Cook County State's Attorney v. Illinois Local Labor Relations Board*, 166 Ill. 2d 296, 306 (1995); *Castaneda v. Illinois Human Rights Comm'n*, 132 Ill. 2d 304, 308 (1989).  An aggrieved party may seek judicial review of an administrative decision without first exhausting administrative remedies for several reasons, including: "where [1] no issues of fact are presented or [2] agency expertise is not involved," or "[3] where the agency's jurisdiction is attacked because it is not authorized by statute."  *Castaneda*, 132 Ill. 2d at 308-09; see also *Office of Cook County State's Attorney*, 166 Ill. 2d at 306.  In the case at bar, all three quoted exceptions apply.  First, no issues of fact are presented, as this matter solely involves the legal issue of statutory interpretation. Second, an " 'agency's particular expertise is not implicated in statutory construction.' "  *Id*. (quoting *Landfill, Inc. v. Pollution Control Board*, 74 Ill. 2d 541, 550 (1978)).  Third, plaintiff attacks the City's jurisdiction or authority to collect the transfer tax, claiming that it was not

authorized by statute. Accordingly, we conclude that the exhaustion doctrine is not a bar to our consideration of the present dispute. *Id*. at 306-07. We now turn to plaintiff's contentions on appeal.

¶ 26                                    C. Transfer Tax Exemption

¶ 27    On appeal, plaintiff contends the circuit court erred in granting the City's motion to dismiss because the enterprises were transformed into governmental bodies when the Agency appointed itself as their conservator in 2008. Plaintiff further asserts that the enterprises are federal instrumentalities, and as such, they can be considered governmental bodies. In addition, plaintiff argues entities created by the government to carry out a public function are governmental bodies under the transfer tax ordinance and relies on *Hubble v. Bi-State Development Agency of the Illinois-Missouri Metropolitan District*, 238 Ill. 2d 262 (2010), as well as the definition of "governmental body" found in the Illinois Administrative Code (86 Ill. Adm. Code 120.20(e)(4) (2004)), as authorities for this assertion. Finally, plaintiff maintains DuPage County considers the enterprises to be governmental bodies and exempts them from a similar tax. For the following reasons, we conclude that the term "governmental body" as stated in section 3-33-060(B) of the Municipal Code does not encompass the enterprises and thus affirm the judgment of the circuit court.

¶ 28    The trial court granted the City's motion to dismiss pursuant to section 2-615 of the Code. 735 ILCS 5/2-615 (West 2018). A section 2-615 motion to dismiss attacks the legal sufficiency of a complaint by alleging defects on the face of the complaint. *Vitro v. Mihelcic*, 209 Ill. 2d 76, 81 (2004). When ruling on a section 2-615 motion, the relevant question is whether the allegations in the complaint, construed in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted. *Canel v. Topinka*, 212 Ill.

2d 311, 317 (2004). A motion to dismiss should not be granted with prejudice "unless it is clear that no set of facts can be proved under the pleading which would entitle the plaintiff to relief." *Smith v. Central Illinois Regional Airport*, 207 Ill. 2d 578, 584-85 (2003). Illinois is a fact-pleading state; conclusions of law and conclusory allegations unsupported by specific facts are not sufficient to survive dismissal. *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 408 (1996).

¶ 29 We review the dismissal of a complaint pursuant to section 2-615 *de novo*. *Mauvais-Jarvis v. Wong*, 2013 IL App (1st) 120070, ¶ 64. In addition, the interpretation of a municipal ordinance presents a question of law which we review *de novo*. *Faison v. RTFX, Inc.*, 2014 IL App (1st) 121893, ¶ 29. *De novo* consideration means we perform the same analysis that a trial court would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). Furthermore, we may affirm the circuit court on any basis appearing in the record, even if the court did not rely on that reasoning. *Dotty's Cafe v. Illinois Gaming Board*, 2019 IL App (1st) 173207, ¶ 26.

¶ 30 Plaintiff's arguments revolve around the interpretation of the phrase "governmental body" as it is used in Chicago's transfer tax ordinance (Chicago Municipal Code § 3-33-060(B) (amended May 8, 2013)). Specifically, we must determine whether the enterprises are governmental bodies, as transfers of real property from governmental bodies are exempt from the tax. See *id*.

¶ 31 Municipal ordinances are interpreted using the same rules of statutory interpretation. *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 7 (2009). The most fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. *In re Estate of Andernovics*, 197 Ill. 2d 500, 507 (2001). The statute's language is the best indicator of such intent. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 504 (2000). The statutory language

must be given its plain, ordinary, and popularly understood meaning. *In re Detention of Lieberman*, 201 Ill. 2d 300, 308 (2002). "Where the language in the statute is clear and unambiguous, this court will apply the statute as written without resort to extrinsic aids of statutory construction." *Landis*, 235 Ill. 2d at 6-7. Moreover, "[i]f the language is clear and unambiguous, we may not depart from the plain language and meaning of the statute by reading into it exceptions, limitations or conditions that the legislature did not express, nor by rendering any word or phrase superfluous or meaningless." *Cuevas v. Berrios*, 2017 IL App (1st) 151318, ¶ 33. We must read all parts of the statute together and not in isolation, so as to "produce a harmonious whole." *Dow Chemical Co. v. Department of Revenue*, 224 Ill. App. 3d 263, 266 (1991).

¶ 32    In addition, "[s]tatutes that exempt property or an entity from taxation must be strictly construed in favor of taxation and against exemption." *Lombard Public Facilities Corp. v. Department of Revenue*, 378 Ill. App. 3d 921, 935 (2008). The taxpayer bears the burden of proving she is entitled to an exemption (*Metro Developers, LLC v. City of Chicago Department of Revenue*, 377 Ill. App. 3d 395, 397 (2007)), and all facts are to be construed and all debatable questions resolved in favor of taxation (*Lombard*, 378 Ill. App. 3d at 936). The party requesting the exemption must prove its entitlement clearly and conclusively. *Wyndemere Retirement Community v. Department of Revenue*, 274 Ill. App. 3d 455, 459 (1995). Courts may not create or extend exemptions from taxation by judicial interpretation of a statute. *Lombard*, 378 Ill. App. 3d at 936.

¶ 33    The transfer tax ordinance does not define the term "governmental body," nor is the term defined elsewhere in the Municipal Code. See Chicago Municipal Code § 3-33-010 *et seq*. (added Dec. 15, 1992). Despite plaintiff's contention, however, even if the enterprises can be

considered federal instrumentalities, a federal instrumentality is not the same as a governmental body.  As discussed further below, the term "governmental body" is unambiguous and necessarily excludes entities such as governmental agencies and instrumentalities.  See *Lawrence v. Regent Realty Group, Inc.*, 197 Ill. 2d 1, 10 (2001) ("a court may not depart from [the statute's] plain language by reading into it exceptions, limitations, or conditions not expressed by the legislature").

¶ 34  A main tenet of statutory construction is that the use of certain language by the city council in one instance and different language in another instance indicates the city council intended different results.  *Julie Q. v. Department of Children and Family Services*, 2013 IL 113783, ¶ 41.  Thus, the express mention of one thing in a statute or ordinance excludes all other things not mentioned.  See *Welch v. Johnson*, 147 Ill. 2d 40, 52 (1992).

¶ 35  A review of title 3 of the Municipal Code, which contains all of Chicago's tax ordinances, reveals the use of terms such as "governmental bodies," "governmental agencies," "departments of the State of Illinois," "political subdivisions," "public or municipal corporations," "the federal government," and "the United States Government or any agency thereof."  Chicago Municipal Code § 3-16-040 (amended Dec. 4, 2002) (exempting from the boat mooring tax any watercraft owned by a governmental body); Chicago Municipal Code § 3-29-050(A) (amended May 6, 2015) (exempting motor vehicles that are purchased and used by a governmental agency from the use tax for nonretail transfers of motor vehicles); Chicago Municipal Code § 3-32-040(A) (added Dec. 15, 1992) (exempting from the personal property lease transaction tax any lessee that is a governmental body); Chicago Municipal Code § 3-41-030(D)(1) (amended Nov. 8, 2012) (exempting the use or consumption of gas by a governmental body from the gas use tax); Chicago Municipal Code § 3-46-060(D) (amended Mar. 26, 1996)

(exempting from the ground transportation tax certain vehicles provided to a governmental body); Chicago Municipal Code § 3-48-030(D) (amended Nov. 16, 2011) (exempting from the motor vehicle lessor tax any lessor who is a governmental body); Chicago Municipal Code § 3-52-110(f) (amended June 7, 1990) (exempting the sale or use of vehicle fuel by the federal government or any state or local governmental body from the vehicle fuel tax); Chicago Municipal Code § 3-56-140 (amended Dec. 12, 2007) (exempting from requiring a wheel tax license all vehicles owned and operated by the United States government or any agency thereof, or by the State of Illinois or any department thereof, or by any political subdivision, public or municipal corporation of the State of Illinois or any department or other agency of such corporation).

¶ 36    The transfer tax at issue here solely exempts governmental bodies, *i.e.*, "exempt from the tax" are "[t]ransfers involving real property acquired by or from any governmental body." Chicago Municipal Code § 3-33-060(B) (amended May 8, 2013). In utilizing this specific language, the city council excluded from the transfer tax exemption other entities such as governmental agencies and political subdivisions, which are afforded exemptions elsewhere in the Municipal Code. See *Welch*, 147 Ill. 2d at 52. The plain language of the transfer tax therefore indicates the city council's intent was to exempt from the transfer tax property acquired by or from governmental bodies, and *not* property acquired by or from governmental agencies or instrumentalities. See *Julie Q.*, 2013 IL 113783, ¶ 41; *Welch*, 147 Ill. 2d at 52. Accordingly, even if the enterprises could be considered governmental instrumentalities as a result of the Agency's conservatorship, as plaintiff contends, it does not follow that the city council intended them to be under the umbrella of a "governmental body" where the city council was clearly able to define the term to be so inclusive. See *id*.; *Lawrence*, 197 Ill. 2d at 10; *Federal Land Bank of*

*St. Louis v. Priddy*, 295 U.S. 229, 233 (1935) (holding that federal instrumentalities may "have many of the characteristics of private business corporations, distinguishing them from the government itself and its municipal subdivisions").

¶ 37    Our interpretation of the term governmental body is supported by an informational bulletin released by the Chicago Department of Finance in 2005 which expressly states that the enterprises do not qualify as governmental bodies under the transfer tax exemption in section 3-33-060(B) of the Municipal Code. *Chicago Real Property Transfer Tax*, Informational Bulletin, Chi. Dept. Rev., Vol. 9, No. 1 (Oct. 2005) (https://www.chicago.gov/dam/city/depts/rev/supp_info/TaxSupportingInformation/October_2005_Info_Bulletin_RPTT.pdf (last visited Sept. 24, 2019)).  Section 3-33-140 of the Municipal Code authorizes the comptroller of the Department of Finance to "adopt, promulgate and enforce rules and regulations pertaining to the administration and enforcement" of chapter 3-33.[2] Chicago Municipal Code 3-33-140 (amended Nov. 16, 2011).  While an informational bulletin published by the Department of Finance is not necessarily equivalent to an official tax ruling or regulation, the bulletin here placed the public on notice as to the status of the enterprises, specifically that they are not governmental bodies under the transfer tax.  Since the Agency commenced its conservatorship over the enterprises in 2008, the Department of Finance has issued 12 additional informational bulletins yet has not changed its position on the issue.  In addition, the 2005 bulletin remains on the the City of Chicago website for the Department of Finance.[3]  Furthermore, subsequent to 2008, the city council amended section 3-33-060 of the Municipal Code, and declined to include any language contradicting the informational bulletin.

---

[2] The version of the Municipal Code in effect in 2005 granted the same authorization to the director of the Chiago Department of Revenue (Chicago Municipal Code § 3-33-140 (added Dec. 15, 1992)).

[3] https://www.chicago.gov/city/en/depts/fin/supp_info/revenue/information_bulletins html (last visited Sept. 24, 2019)

Chicago Municipal Code § 3-33-060(B) (amended May 8, 2013). Although informational

bulletins are not part of the Municipal Code—and therefore do not carry the force and effect of

law (*City of Chicago v. Roman*, 184 Ill. 2d 504, 511 (1998))—we find it implausible that the city

council would remain silent for over 10 years if the informational bulletin contradicted its intent.

¶ 38     Our interpretation of the term governmental body is additionally supported, in part, by

the framework set forth in *Lombard*. *Lombard*, 378 Ill. App. 3d at 935. In that case, this court

was tasked with determining whether the Lombard Public Facilities Corporation (LPFC) was a

"governmental body" pursuant to the Retailer's Tax Act (35 ILCS 120/2-5(11) (West 2004)). *Id*.

at 923. The Village of Lombard incorporated LPFC, a not-for-profit corporation, to "assist in the

financing and construction of a convention hall and hotel facility" in the Village. *Id*. LPFC was

granted authority to issue, sell, and deliver bonds; encumber any real property or equipment

acquired by it for the purpose of the project; and enter into contracts for the construction and

acquisition of the convention hall and hotel facility. *Id*. at 923-24. The articles of incorporation

for LPFC stated that its purpose was to "assist the Village of Lombard in its essential

governmental purposes." *Id*. at 924. Moreover, the Village was allowed to remove any director

or officer with or without cause by the majority vote of the president and the board of trustees of

the Village. *Id*. The Village appointed the initial directors and retained the right to fill any

vacancies. *Id*.

¶ 39     The Village and LPFC entered into an agreement whereby LPFC was to obtain a surety

bond and submit construction plans to the Village for approval. *Id*. The Village agreed to

provide funds to make debt service payments on LPFC's surety bonds only if income from the

project was insufficient. *Id*. The Village's taxing power and full faith and credit were not

pledged as security for any of the bonds (*id*.), and Village did not otherwise funnel any of its own

funds to LPFC (*id*. at 932). LPFC had no authority to sell the property used for the project without the consent of the Village. *Id*. at 926. Further, LPFC was staffed by Village employees and meetings were held at the Village in accordance with the Open Meetings Act. *Id*. LPFC did not have the ability to impose taxes, maintain a police force, or provide water or sewer treatment, and it did not receive any charter from Illinois recognizing it as a governmental body. *Id*.

¶ 40    LPFC filed an application for exemption from the Retailer's Tax Act on the basis that its purchases made for the construction of the hotel and convention center were those of a governmental body. *Id*. at 924. The Illinois department of revenue denied the application, and that decision was affirmed by an administrative law judge. *Id*. at 924-25, 927. On appeal, the reviewing court agreed that LPFC was not a governmental body. *Id*. at 932-36. In so holding, it found that LPFC's status had to be considered separate and apart from the Village, and determined that that LPFC: "(1) had little or no control over the Village and its decisions; (2) was not organized as an agency or branch of the Village itself; and (3) did not perform a function necessary to maintain the Village's existence. *** Overall, the Village was not dependent upon LPFC for its governmental activities, and LPFC was also not dependent on the Village for its day-to-day project management activities." *Id*. at 935.

¶ 41    Applying the framework set forth in *Lombard* to the case at bar, like LPFC in *Lombard*, the enterprises do not have the ability to impose taxes, maintain a police force, or provide water or sewer treatment, and their charters do not recognize them as governmental bodies. See *id*. at 926. Furthermore, the federal government does not fund the enterprises.[4] See *id*. at 932. The

---

[4] We acknowledge plaintiff's contention that "federal funds are on the line as 'Fannie Mae has received some $116 billion from the Treasury to maintain liquidity; Freddie Mac has received some $71 billion.' [*Sisti v. Federal Housing Finance Agency*, 324 F. Supp. 3d 273, 276 (D.R.I. 2018).]" Plaintiff, however, mischaracterizes the nature of the Treasury's financial arrangement with the enterprises. The federal government did not simply fund the enterprises with tax dollars. Rather, the enterprises received funds pursuant to a series of agreements between the Agency, as conservator for the enterprises, and the Department of Treasury, under which the Treasury received shares of senior preferred stock and the enterprises agreed to pay the Treasury back by regularly turning over a

enterprises, like LPFC in *Lombard*, (1) have little or no control over the federal government or its decisions, (2) are not organized as branches of the government itself, and (3) do not perform a function necessary to maintain the government's existence. See *id*. at 935. The federal government is not dependent on the enterprises for its governmental activities, and the enterprises are also not dependent on the government for its day-to-day activities. See *id*.

¶ 42    Although plaintiff alleged in the amended complaint that the enterprises are "government-sponsored enterprises" under federal law (2 U.S.C. § 622(8) (2018)), the federal statute reveals that they are privately owned, the money they borrow is not backed by the full faith and credit of the federal government, they do not exercise powers reserved to the government, they do not have the power to commit the government financially, and their employees are not federal employees. *Id*. § 622(8)(A)(ii), (A)(iv)(II), (B)(i)-(iii) (2018). Moreover, each enterprise was created as a "body corporate" and the Agency, which succeeded to the enterprises' rights and powers, is independent of the federal government. 12 U.S.C. § 1452(a)(1) (2018); 12 U.S.C. § 1717(a)(1)(2018); 12 U.S.C. § 4511(a) (2018). Accordingly, we find the enterprises are not governmental bodies so as to be exempt the transfer tax. See *Lombard*, 378 Ill. App. 3d at 935.

¶ 43    Plaintiff maintains, however, that the enterprises transformed into governmental bodies as a result of the Agency succeeding to "all rights, titles, powers, and privileges" of the enterprises in 2008. 12 U.S.C. § 4617(b)(2)(A)(i) (2018). In fact, the opposite is true: when the Agency became conservator, the Agency lost its governmental character and assumed the non-governmental character of the enterprises. See *Herron v. Fannie Mae*, 861 F.3d 160, 169 (D.C. Cir. 2017).[5] As explained by D.C. Circuit Court of Appeals in *Herron*, the language in 12

---

portion of the enterprises' dividends. See *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 600-02 (D.C. Cir. 2017).
    [5] Federal decisions are not binding on Illinois state courts. *Werderman v. Liberty Adventures, LLC*, 368 Ill.

U.S.C. § 4617(b)(2)(A)(i) (2018) allowing the Agency to succeed to "all rights, titles, powers, and privileges" of the enterprises "evinces Congress's intention to have the [Agency] step into Fannie Mae's private shoes. [Citation.] When it stepped into these shoes, the [Agency] 'shed[ ] its government character and… [became] a private party.' [Citation.] But while the [Agency's] status changed, the status of Fannie Mae, as the 'shoes' into which the [Agency] stepped, did not. [Citation.]" *Id*. In other words, when the Agency succeeded to "all rights, titles, powers, and privileges" of the enterprises, it was granted the rights and powers of the enterprises, but the enterprises were not granted the rights and powers of the government. See *id*.; *U.S. ex rel. Adams v. Aurora Loan Services, Inc.*, 813 F.3d 1259, 1261 (9th Cir. 2016) (the conservatorship "places [the Agency] in the shoes of [the enterprises], and gives the [Agency] *their* rights and duties, not the other way around" (emphasis in original)). The Agency's conservatorship therefore did not transform the enterprises into governmental bodies where (1) the status of the enterprises as privately owned corporations did not change as a result of the conservatorship, and (2) the Agency "shed its governmental character" when it became conservator. See *Herron*, 861 F.3d at 169; *Adams*, 813 F.3d at 1261.

¶ 44    Plaintiff asserts that *Herron* is inapplicable because it involved a first amendment claim rather than the transfer tax or Illinois law. See *Herron*, 861 F.3d at 163. Plaintiff, however, does not refute the court's characterization of the relationship between the enterprises and the Agency discussed above. See *id*. at 169. Instead, plaintiff attacks the holding of the D.C. Circuit Court that Fannie Mae is not a "government actor" for purposes of a first amendment retaliation claim. See *id*. at 167-69. Specifically, plaintiff challenges the court's finding that Fannie Mae failed to

App. 3d 78, 84 (2006). They may, however, be considered to be persuasive authority and they may be followed if we believe the federal analysis to be reasonable and logical. *Id*. Here, we have reviewed the court's analysis in *Herron*, as well as the cases upon which the court relied, and find them to be reasonable and logical. See *Herron*, 861 F.3d at 169.

satisfy one of the factors courts consider in determining whether a corporation is "part of the Government" for constitutional purposes, namely that the government must retain permanent control over the enterprise. See *id*. at 167-70.

¶ 45     Plaintiff's reliance on *Sisti*, 324 F. Supp. 3d at 281, for the proposition that the government does, in fact, retain permanent control over the enterprises, thus designating them government actors, is not persuasive. *Sisti* was decided by a federal district court, which expressly acknowledged its holding conflicted with holdings by the D.C. Circuit in *Herron* and the Sixth Circuit. *Sisti*, 324 F. Supp. 3d at 277; see *County of Du Page v. Lake Street Spa, Inc.*, 359 Ill. App. 3d 110, 122 (2009) (noting that the federal district court is inferior to the federal circuit court of appeals). More importantly, as we discussed above, the enterprises' status as government actors is irrelevant where the transfer tax exempts solely "governmental bodies." See *Priddy*, 295 U.S. at 233; *Julie Q.*, 2013 IL 113783, ¶ 41; *Lawrence*, 197 Ill. 2d at 10; *Welch*, 147 Ill. 2d at 52.

¶ 46     Plaintiff further argues the enterprises are governmental bodies because they provide a public function. In support of this contention, plaintiff points to section 31-45(b) of the Illinois Real Estate Transfer Tax Law (Illinois Transfer Tax), a similar transfer tax which exempts property acquired by or from governmental bodies. 35 ILCS 200/31-45(b) (West 2018). Plaintiff observes that the Illinois Administrative Code (Administrative Code) defines the term "governmental body" as it appears in section 31-45(b) of the Illinois Transfer Tax as an entity "created to carry out a public function by a federal, state, or local unit of government." 86 Ill. Adm. Code 120.20(e)(4) (2004). Plaintiff similarly contends that "a corporation can be a public entity if it was 'created to carry out a public function' " and relies on *Hubble*, 238 Ill. 2d at 272-73, as authority for her assertion.

¶ 47    The record, however, reveals plaintiff never advanced this " public function" theory before the circuit court.  It is axiomatic that an unsuccessful party may not advance a new theory of recovery on appeal, *(In re Anders*, 304 Ill. App. 3d 117, 123 (1999)), and doing so results in forfeiture of that issue on appeal *(Thompson v. N.J.*, 2016 IL App (1st) 142918, ¶ 21). Moreover, plaintiff's new theory is inconsistent with her argument advanced before the circuit court and in her opening brief that the enterprises transformed into governmental bodies solely as a result of the Agency's 2008 conservatorship.  See *Allen v. Allen*, 226 Ill. App. 3d 576, 587 (1992) (theories which are inconsistent with those espoused in the circuit court may not be considered on review).  Nevertheless, we are not required to disregard new arguments and, in the interest of achieving a just result, we will discuss the issue below.  See *Amalgamated Transit Union*, 2017 IL App (1st) 160999, ¶ 60.

¶ 48    We find plaintiff's reliance on the Administrative Code to be misguided.  Plaintiff provides no authority, and we have found none, indicating the city council intended to rely on the Administrative Code.  See *In re Estate of Andernovics*, 197 Ill. 2d at 507 (the most fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent).  In fact, it would have been impossible for the city council to rely on the definition found in the Administrative Code when the transfer tax was initially enacted.  While the transfer tax, including the exemption at issue here, was enacted in 1992, the definition plaintiff relies on was not added to the Administrative Code until 2004.  See *Sayles v. Thompson*, 99 Ill. 2d 122, 125 (1983) ("The meaning of a statute or constitutional provision depends upon the intent of the drafters at the time of its adoption");  Journal of the Proceedings of the City Council of Chicago at 27388-435 (Dec. 15, 1992); 28 Ill. Reg. 7608-610 (proposed June 1, 2004); 28 Ill. Reg. 14155-171 (eff. Oct. 13, 2004).

¶ 49 In addition, numerous sections of the Municipal Code adopt definitions or regulations from the Administrative Code. Chicago Municipal Code § 7-32-010 (amended April 18, 2018) (adopting the definition of "gaming equipment or supplies" as defined in the Illinois Gaming Board Rules of the Administrative Code); Chicago Municipal Code § 9-84-005 (added April 15, 2015) (adopting the definitions of "relocated," "relocating," and "relocation" as defined in 92 Ill. Adm. Code § 1710.10); Chicago Municipal Code § 11-4-720 (added Oct. 7, 2009) (adopting the regulations set forth by Part 212 of Title 35 of the Illinois Administrative Code); Chicago Municipal Code § 11-4-728 (added July 29, 2015) (adopting the regulations set forth in Part 211 and Subpart HH of Part 218 of Title 35 of the Illinois Administrative Code); Chicago Municipal Code § 11-4-2090 (amended May 18, 2016) (adopting the definition of "underground storage tank" and "underground tank" as defined by 41 Ill. Adm. Code 174.100). When a legislative body "includes particular language in one section of a statute but omits it in another section of the same act, courts presume that [the body] has acted intentionally and purposely in the inclusion or exclusion." *Adames v. Sheahan*, 233 Ill. 2d 276, 311 (2009). The city council's decision to omit any reference to the Administrative Code in the transfer tax ordinance therefore indicates it declined to adopt the definitions found therein. Chicago Municipal Code § 3-33 *et seq*. (added Dec. 15, 1992). If the city council intended to adopt the definition of "governmental body" as set forth in the Administrative Code it certainly could have done so in express terms when it amended section 3-33-060 of the Municipal Code in 2008 and 2013.

¶ 50 Importantly, plaintiff has not cited to any case in which courts construed the Municipal Code using an Administrative Code definition where the Municipal Code does not expressly adopt a definition provided in the Administrative Code. Indeed, courts have routinely declined to read Administrative Code definitions into local ordinances. See *Pioneer Trust and Savings*

*Bank v. Cook County*, 71 Ill. 2d 510, 520-21 (1978) ("we are not convinced the [Cook County] zoning ordinance manifestly intended incorporation of the statutory definition. *** the drafters of the zoning ordinance failed to include any language referring to or incorporating statutory definitions"); *Montano v. City of Chicago*, 308 Ill. App. 3d 618, 623 (1999) ("We cannot use definitions in the Illinois Vehicle Code to construe the terms of an ordinance in the Chicago Municipal Code"); *Resman v. Personnel Board of the City of Chicago*, 96 Ill. App. 3d 919, 922 (1981) ("the intent of the Chicago City Council in enacting [the ordinance] cannot be divined by resort to a statute passed by the Illinois legislature"); *Mandarino v. Village of Lombard*, 92 Ill. App. 3d 78, 82-83 (1980) (noting that the doctrine of *in pari materia*—that the intent of the legislature can be deduced from different statutes pertaining to the same subject—was inapplicable where the case involved conflicting provisions between the Lombard Village Code and an Illinois Statute). Accordingly, we conclude the city council did not intend to rely on the definition of "governmental body" provided in the Administrative Code. See *In re Estate of Andernovics*, 197 Ill. 2d at 507.

¶ 51   In any event, we observe that even if we were to accept the definition adopted in the Administrative Code, the State nevertheless does not consider the enterprises to be governmental bodies and imposes its transfer tax on their real estate transactions. In *DeKalb County v. Federal Housing Finance Agency*, 741 F.3d 795, 799-801 (7th Cir. 2013), the enterprises sued the Illinois Department of Revenue for enforcing the Illinois transfer tax. See also *Hamer*, 2013 WL 591979, 1. Although the court found the enterprises were exempt from Illinois' transfer tax based on their federal charters expressly exempting them from "all taxation," the court left open the question of whether the tax could be levied against purchasers of property from the enterprises. *DeKalb County*, 741 F.3d. at 799-801. Moreover, in *Long v. Federal Home Loan*

*Mortgage Corporation*, 2017 WL 1178531, 1 (N.D. Ill. Mar. 30, 2017), the court noted that "Illinois and its subdivisions have imposed [transfer] taxes on the sales of foreclosed properties sold by Fannie and Freddie." In that case, the plaintiffs claimed the enterprises violated the Illinois Consumer Fraud and Deceptive Business Practice Act (815 ILCS 505/1 *et seq.* (West 2016)) by failing to claim a similar transfer tax exemption, causing the plaintiffs to pay the Illinois transfer tax. *Id.* at 1, 3. The court determined that it was not unfair or deceptive for the enterprises to claim the plaintiffs owed the transaction tax where the law was not settled as to whether (1) the tax could be assessed against purchasers of property from the enterprises or (2) the enterprises were exempt as "governmental bodies." *Id.* at 7-8. Thus, even if we were to rely on the definition set forth in the Administrative Code for guidance, plaintiff's argument is belied by the fact that Illinois excludes the enterprises from its own definition of "governmental body." See *DeKalb County*, 741 F.3d at 799-801; *Long*, 2017 WL 1178531, 1, 3.

¶ 52     Plaintiff additionally relies on *Hubble*, 238 Ill. 2d at 272-73, for the proposition that "a corporation can be a public entity if it was 'created to carry out a public function.' " Contrary to plaintiff's contention, however, the court in *Hubble* did not hold that any corporation that is created to perform a public function is therefore a public entity. Rather, the court determined the Bi-State Development Agency of the Illinois-Missouri Metropolitan District (Bi-State) constituted a "form of 'local government body' " under the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/1-206 (West 2006)) because it was (1) expressly created by statute as "a body corporate and politic," and (2) "expressly created to perform public or governmental functions." *Id.* at 272. Specifically, "Bi-State's powers include[d]: (1) planning, constructing, and maintaining bridges, airports, and terminal facilities; (2) making plans for the coordination of streets and highways; (3) charging and collecting fees;

(4) issuing bonds; (5) receiving contributions from local, state, and federal governments; [and] (6) the power to perform all other necessary and incidental functions." *Id*. at 272-73. The court further observed that " '[s]tate law characterizes Bi-State as a local public body.' " *Id*. at 274 (quoting *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 948 F.2d 1084, 1088 (8th Cir. 1991)). The court acknowledged its conclusion was consistent with the Eighth Circuit's discussion of Bi-State in *Barket, Levy & Fine, Inc.*, 948 F.2d at 1088, wherein the court described Bi-State as being "much like a county." *Hubble*, 238 Ill. 2d at 274 (quoting *Barket*, 948 F.2d at 1088). The court further explained that " 'Bi-State's object is to plan, develop, and engage in proprietary functions in a defined region with local governance, for the common good of the communities within the region.' " *Id*.

¶ 53    Here, unlike Bi-State in *Hubble*, the enterprises are not characterized as local public bodies or as "bodies politic," but rather solely as "bodies corporate" under their charters. 12 U.S.C. § 1452(a)(1) (2018); 12 U.S.C. § 1717(a)(1) (2018); see *Hubble*, 238 Ill. 2d at 272, 274. In addition, the enterprises do not plan, develop, or have the power to engage in any of the activities Bi-State was expressly created to perform. See *id*. The enterprises are not at all "like a county." See *Hubble*, 238 Ill. 2d at 272. Accordingly, *Hubble* is inapposite and does not support the conclusion that the enterprises are governmental bodies. See *Id*. at 272-74.

¶ 54    Plaintiff also urges this court to reverse the circuit court's determination where DuPage County considers the enterprises to be governmental bodies under its real estate transfer tax. Plaintiff supports her proposition with the memorandum issued by the DuPage County Recorder which she relied on before the circuit court. We decline to consider this argument because it violates Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018). Specifically, plaintiff provides citations to irrelevant authority and fails to present a well-reasoned argument. See

*Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010); *Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 804 (2009). The failure to elaborate on an argument, cite persuasive authority, or present a well-reasoned theory violates Rule 341(h)(7) and results in forfeiture of the argument. *Vancura*, 238 Ill. 2d at 370; *Sakellariadis*, 391 Ill. App. 3d at 804. In any event, the circuit court thoroughly analyzed plaintiff's contention and concluded that it is devoid of merit. We share the circuit court's assessment as the memorandum issued by the DuPage County Recorder contains no discussion and does not address the issue of whether the enterprises are governmental bodies.

¶ 55 For the foregoing reasons, we find the amended complaint failed to state a cause of action upon which relief may be granted where the enterprises do not fall within the scope of the governmental body exemption of the transfer tax. See Chicago Municipal Code § 3-33-060(B) (amended May 8, 2013); *Julie Q.*, 2013 IL 113783, ¶ 41; *Canel*, 212 Ill. 2d at 317; *Smith*, 207 Ill. 2d at 584-85; *Lombard*, 378 Ill. App. 3d at 935; *Herron*, 861 F.3d at 169.

¶ 56                                  III. CONCLUSION

¶ 57 For the reasons stated above, we affirm the judgment of the circuit court of Cook County dismissing Trilisky's amended complaint.

¶ 58 Affirmed.

## No. 1-18-2189

| | |
|---|---|
| **Cite as:** | Nina Trilisky v. City of Chicago, 2019 IL App (1st) 182189 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15 CH 16334; the Hon. Michael F. Otto, Judge presiding. |
| **Attorneys for Appellants:** | Elizabeth A. Fegan and Daniel J. Kurowski, of Hagens Berman Sobol Shapiro LLP, of Chicago, for appellant<br><br>David Freydin, of Freydin Law Firm LLP, of Skokie, Illinois, for appellant |
| **Attorneys for Appellees:** | Mark A. Flessner, Benna Ruth Solomon, Myriam Zreczny Kasper, and Suzanne M. Loose, of Corporation Counsel of the City of Chicago, for appellee. |